F.  MICHAEL DAILY, JR., LLC
ATTORNEY AT LAW
216 Haddon Avenue • Sentry Office Plaza
Suite 106
Westmont, New Jersey 08108
Telephone No.  (856) 833-0006
Fax No.  (856) 833-1083

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

|                          | :  |                          |
| ------------------------ | -- | ------------------------ |
| HARRY SWAIN              | :  |                          |
|           Plaintiff      | :  |        CIVIL ACTION      |
|    vs.                   | :  |                          |
|                          | :  |                          |
|                          | :  |   Case No. 1:09-cv-6188  |
| THE CITY OF VINELAND     | :  |                          |
|           Defendant      | :  |                          |
|                          | :  |                          |

---

**Plaintiff, Harry Swain's Brief in Opposition to Motion for Summary Judgment**

---

# TABLE OF CONTENTS

PAGE

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . iii

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . 1

CONCISE SUMMARY OF FACTS . . . . . . . . . . . . . . . . . 2

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY JUDGEMENT STANDARD . . . . . . . . . . . . . . . . 8

Point I . . . . . . . . . . . . . . . . . . . . . . . . . 9

> The Applicable Legal Standards for
> Discrimination Claims on Account of
> Age Are Not the Same under the ADEA
> and the LAD . . . . . . . . . . . . . . . . . . . . 9

Point II . . . . . . . . . . . . . . . . . . . . . . . . 12

> Plaintiff Suffered an Adverse Action
> When He Was Denied a Position in the
> K-9 Unit . . . . . . . . . . . . . . . . . . . . . 12

Point III . . . . . . . . . . . . . . . . . . . . . . . 14

> The Plaintiff Has Sufficient
> Evidence that He Possessed the
> Minimum Qualifications For the K-9
> Position and the Issue of Whether He
> Lived Too Far From the Police
> Station Should be Left to the
> Pretext Stage . . . . . . . . . . . . . . . . . . 14

Point IV . . . . . . . . . . . . . . . . . . . . . . . . 15

> That Non-Members of Plaintiff's
> Protected Class Were Not Treated
> More Favorably Proves Nothing . . . . . . . . 15

i

**Point V** . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

        **Factual Issues Exist as to Whether
the Presently Claimed Legitimate,
Non-Discriminatory Reason for
Selecting Other Officers for K-9 Was
the True Reason or a Pretext** . . . . . . . . . **16**

**Point VI** . . . . . . . . . . . . . . . . . . . . . . . . . **18**

        **The Plaintiff Has Established a
*Prima Facie* Case of Retaliation** . . . . . . . **19**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . **20**

**EXHIBIT A**      **POSITION STATEMENT OF CITY OF VINELAND TO EEOC**

# TABLE OF CITATIONS

**PAGE**

Barber v. CSX Distribution Services,
68 F.3d 694, 701 (3d Cir. 1995) . . . . . . . . . . . . 18

Bergen Commercial Bank v. Sisler,
157 N.J. 188, 209, 723 A.2d 944, 954 (1999) . . . . . 11,18

Burlington N. & Santa Fe Ry. Co. v. White,
548 U.S. 53, 71, 126 S. Ct. 2405, 2417(2006) . . . . . 12

Celotex Corp. v. Catrett,
477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . 8

C.N. v. Ridgewood Bd. of Educ.,
430 F.3d 159, 173 (3d Cir. 2005) . . . . . . . . . . . 9

Desert Palace, Inc. v. Costa,
539 U.S. 90, 94-95, 123 S.Ct. 2148 (2003) . . . . . . . 10

Durham Life Ins. Co. v. Evans,
166 F.3d 139, 155 (3d Cir. 1999) . . . . . . . . . . 19

Erie v Tompkins,
304 U.S. 64 (1938) . . . . . . . . . . . . . . . . . 11

Fuentes v. Perskie,
32 F.3d 759, 764 (3d Cir. 1994) . . . . . . . . . . . 17

Gross v. FBL Financial Services, Inc.,
129 S.Ct. 2343, 2350 (2009) . . . . . . . . . . . 1,9,10

Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,
90 F.3d 737, 743 (3d Cir.1996) . . . . . . . . . . . 8

Ingersoll-Rand Financial Corp. v. Anderson,
921 F.2d 497, 502 (3rd  Cir.1990) . . . . . . . . . . 8

Marzano v. Computer Science Corp. Inc.,
91 F.3d 497, 509 (3rd Cir. 1996) . . . . . . . . . . 15

McDevitt v. Bill Good Builders, Inc.,
175 N.J. 519, 531-32, 816 A.2d 164, 171 (2003) . . . . . . 11,18

Price Waterhouse v. Hopkins, 490 U.S.
228, 109 S.Ct. 1775 (1989) . . . . . . . . . . . . . . . . 10

Skerski v. Time Warner Cable Company,
257 F.3d 273, 278 (3rd Cir. 2001) . . . . . . . . . . . . . 8

Texas Dept. of Cmty. Affairs v. Burdine,
450 U.S. 248, 253-54, 101 S. Ct. 1089, 1094 (1981) . . . . . 14

N.J.S.A. 10:5-12(a) . . . . . . . . . . . . . . . . . . . . 10

## PROCEDURAL HISTORY

On December 7, 2009, the Plaintiff filed the present action alleging discrimination on account of age, in violation of the ADEA and the NJLAD on account of his municipal employer's failure to award him a position as a K-9 Officer.  In his suit, the Plaintiff also alleged that he was the victim of retaliation by his employer, because he had filed a Complaint, alleging age discrimination.

Discovery is now closed and the Defendant employer moves for summary judgment *[Document 20]*.  In doing so, the Defendant alleges that the Plaintiff cannot establish a prima face case nor can it show that the reasons offered by the employer, as a justification for its actions, were pretextual.  In addition, the Defendant argues that the Federal standard for reviewing age discrimination complaints as enunciated by the United States Supreme Court in <u>Gross v. FBL Financial Services, Inc</u>., 129 S.Ct. 2343, 2350 (2009), applies to both the Plaintiff's Federal and State claims and therefore the Plaintiff must establish "but for" causation and that the "mix motives" burden shifting cannot apply to this case.

The Plaintiff presently opposes this motion, asserting that genuine issues of material fact exist, as to both whether the Plaintiff has established a prima face case and as to the real reasons behind the employer's failure to award the Plaintiff the

position in question.  In addition, the Plaintiff argues that because he possesses direct evidence of discrimination, a mixed motives analysis is required as to his claim under the New Jersey Law Against Discrimination.

## CONCISE SUMMARY OF FACTS

The facts relevant to this motion are set forth in detail in the Plaintiff's R.56.1 Statement of Facts.  The Plaintiff incorporates all of said facts into this brief.  The following is a quick summary of those facts.

Incredibly the Defendant, City of Vineland, at all times relevant to this case, had a written policy authorizing Age Discrimination against police and fireman.  That policy, drawn by counsel for the City, specifically indicates that the ADEA does not apply to police officers in any respect.  In light of that stated policy, it is not all inconceivable, as normally would be the case, that a high ranking official, Captain Letizia, who was handling the awarding of the K-9 position, would directly state to the Plaintiff, that the real reason that he wasn't getting the K-9 position was because of his age.

In 2006, the City of Vineland, decided to reinstitute a K-9 program.  The solicitation for interested parties, which was sent by Captain Letizia, was directed solely to superior officers and set forth no disqualifying factors.  The Plaintiff applied and

-2-

was rejected and accepted the excuse given at that time that he "lived too far" from police headquarters.

In December of 2007, it was determined to appoint two more K-9 officers. Again the solicitation was directed to superior officers, specifically Sergeants. The solicitation did not say "any Sergeants who live in Vineland or in close proximity thereto", only Sergeants. Again, Captain Letizia was handling the process.

The Plaintiff immediately applied for the position, and he was the only one so doing and thus, Captain Letizia was deprived of an excuse that "we have a better candidate because he lives closer." In addition, and significantly, the Plaintiff never received a written response to his email, applying for the position.

Instead on December 20, 2007, a supervisor of the Plaintiff, Lieutenant D'Augostine, advised the Plaintiff that he was not going to get the job, but suggested that the Plaintiff discuss the matter with Captain Letizia. Thereafter, the Plaintiff, on same day, had a discussion with Captain Letizia as to why he didn't get the K-9 position. At that point Captain Letizia straight forwardly advised the Plaintiff that the primary reason was "because of your age." Following this conversation with Letizia, the Plaintiff had a follow-up conversation with Lieutenant D'Augostine, who was sympathetic to the Plaintiff's position and in fact advised him that he had informed management that he,

-3-

D'Augostine, felt that the Plaintiff was being improperly discriminated against.  D'Augostine further advised the Plaintiff that he had overheard a conversation between the Chief and Captain Letizia, in which they had indicated that age was the reason for the Plaintiff being denied the position.

The following day, December 21, 2007, Captain Letizia, issued a new solicitation for candidates for K-9 Officer, which was now addressed to Patrol Officers as opposed to Sergeants, or other superior officers.  In response to this, at least three younger patrolmen applied, and two of them, Bontcue and Mackafee, were awarded the position, with an announcement being made to that effect on January 3, 2008.  Prior to the aforesaid selection, Bontcue had provided the Plaintiff with a copy of a memo that he had sent in July of 2006 to a supervisor.  In that memo, Bontcue had related age discriminatory comments by management personnel in regard to older officers being capable of appointment as K-9 Officers.  Whether or not Bontcue in his memo, accurately related what management personnel had to say, the fact remains that no document from management has been produced rebutting Bontcue's perception.  This is, more likely than not, because the views expressed by Bontcue were consistent with the views of management.

On January 8, 2008, a series of retaliatory acts against the Plaintiff commenced.  A memo prepared by D'Augostine, which establishes that the commencement of these acts, states that these

-4-

acts were was directly related to the fact that the Plaintiff was making a claim of discrimination.  In this regard, D'Augostine specifically states that he summoned the Plaintiff in on January 8, 2008, because he had heard a rumor that the Plaintiff had an intention to file a discrimination law suit.

At that meeting the Plaintiff was berated by D'Augostine who attempted to encourage the Plaintiff to forget about the age comments of Captain Letizia.  When this was to no avail, D'Augostine suggested that the Plaintiff file a written complaint.

The following day, Lieutenant D'Augostine's suggestion, was turned into an order by Captain Letizia that the Plaintiff file a written complaint.  When the Plaintiff responded by indicating he wanted to speak to his attorney about the matter, the Chief intervened and ordered the Plaintiff to appear before Internal Affairs to provide a statement.

On January 15, the day following the Chief's order, that the Plaintiff appear before Internal Affairs, the Plaintiff was at a training session.  At the time, the Plaintiff, in a fashion totally contrary to applicable regulations of the New Jersey Attorney General, was requested to take a drug test, in a manner which revealed to all the officers with him, that he was the subject of such test.  The highlight of this episode was the officer in charge walking with the Plaintiff in front of other

officers, while holding the collection vile and wearing gloves.  In addition, other supervisors suddenly began harassing the Plaintiff and demeaning him.  Furthermore, in early October of 2008, the Police Department, without justification interfered in medical care being rendered to the Plaintiff.

In May of 2008, the Plaintiff was involved in a serious motor vehicle accident and had to undergo surgery to his right shoulder.  Post surgery he continued to have neck problem and began to experience carpel tunnel symptoms.  The Plaintiff was being treated for these injuries by doctors specifically authorized by the City and its workers comp carrier, PMA.  On October 6, 2008, Dr. Silver, the primary worker's compensation doctor, based upon clinical findings and diagnostic studies, determined that the Plaintiff required surgery and scheduled him for such surgery on October 23, 2008.  Before the surgery could take place it was cancelled by the PMA representation, Ms. Richardson. Subsequently, when the Plaintiff confronted Ms. Richardson and Mr. Dickinson's the City's Risk Manager, about the reason for the cancellation of his surgery, they confessed that it was done at the request of the Police Department, who obviously are not doctors. As a result, the Plaintiff had to endure additional pain and suffering in connection with his left wrist, until surgery was finally approved and performed in January of 2009.

The foregoing, however, was not the end of the City's

-6-

retaliatory conduct.  When the Plaintiff, after his recovery from surgery, finally returned to his old position with the Street Crimes Unit, he was demoted and assigned to work for a Junior Sergeant's Unit.

Finally, the denial of a position as a K-9 Officer, resulted in hard economic losses to the Plaintiff.  While all officers have opportunities for overtime, a K-9 Officer, due to his special position has much greater opportunities.  This is pointed out by the fact that during a relevant period, Officer Bontcue has earned over $30,000.00 in overtime, while the Plaintiff has earned only a sum of approximately $5,000.00.[1]

In summary, the facts establish that the Plaintiff applied for a position, that was not a "mere lateral transfer." The K-9 position that the Plaintiff sought, was a special position that required special skills, knowledge and abilities.  In addition, it offered special monetary benefits, in terms of overtime and compensation for taking care of the animal, while at home.  The Defendant has attempted to produce the proverbial bag full of explanations for its actions in rejecting the Plaintiff. None of those reasons are supported by rules, regulations or other documentary evidence.  Instead it is the Defendants who have come

---

[1]     The Defendants at p.12 of their Brief, provide a chart listing the Plaintiff's overtime.  The Plaintiff, however, cannot locate any documents, presented in the summary judgment record, that support these figures.

forward with "self-serving" statements as to matters that apparently have only existed in their minds.  In light of the fact that Plaintiff has direct evidence of age discrimination and a written policy condoning such discrimination, this matter should proceed to a jury to determine if the foregoing facts of the Plaintiff or the facts proffered by the Defendants are true.

## **LEGAL ARGUMENT**

### **Summary Judgement Standard**

Under Fed. R. Civ. 56  summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party moving for summary judgment bears the initial affirmative duty to "demonstrate that the evidence creates no genuine issue of material fact." Skerski v. Time Warner Cable Company, 257 F.3d 273, 278 (3rd Cir. 2001), citing Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir.1996)).  "In addition, any unexplained gaps in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment." Ideal Dairy Farms, id., quoting Ingersoll-Rand Financial Corp. v. Anderson, 921 F.2d 497, 502 (3rd

Cir.1990)).

Once the moving party has made and supported its motion, the adverse party may not rest upon the mere allegations or denials of the its pleadings, but must set forth specific admissible facts. Then the court must determine "whether there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiffs... [The Court is]... required to review the record and draw inferences in a light most favorable to the non-moving party, yet the non-moving party must provide admissible evidence containing specific facts showing that there is a genuine issue for trial. Summary judgment may not be granted, however, if there is a disagreement over what inferences can reasonably be drawn from the facts even if the facts are undisputed." C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005).


### Point I

**The Applicable Legal Standards for Discrimination Claims on Account of Age Are Not the Same under the ADEA and the LAD.**

The Plaintiff agrees with the Defendant that insofar as the ADEA is concerned: "To establish the disparate-treatment claim under the plain language of the ADEA, Plaintiff must prove that age was the 'but-for' cause of his employer's adverse decision. Gross v. FBL Financial Services,Inc., 129 S.Ct. 2343, 2350 (2009). The

burden of proof never shifts to an employer to show that it would have taken the action regardless of age, even if the Plaintiff produces some evidence that age was one motivating factor in that decision." *Defendant's Brief, pg. 8.* However, the decision in <u>Gross</u> was based upon the premise that Title VII and the ADEA were separate laws, Congress had seen fit to codify the "mixed motives" analysis of <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 109 S.Ct. 1775 (1989) into Title VII but not the ADEA and "[w]e cannot ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to the ADEA. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally." <u>Gross</u>, *supra,* at 2349. The Court therefore held, as inapplicable to ADEA claims, any mixed motives analysis as permitted in Title VII cases such as <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 94-95, 123 S.Ct. 2148 (2003).

In New Jersey, however: "It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: a. For an employer, because of the race, creed, color, national origin, ancestry, <u>age</u>, marital status, affectional or sexual orientation ....to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.J.S.A. 10:5-12(a). Unlike the federal scheme, in New Jersey age and other forms of discrimination are covered by the same law. The rationale of <u>Gross</u> therefore doesn't apply and it is

extremely difficult to perceive that the New Jersey Supreme Court without such a rationale present would reverse its decisions in Bergen Commercial Bank v. Sisler, 157 N.J. 188, 209, 723 A.2d 944, 954 (1999) and McDevitt v. Bill Good Builders, Inc., 175 N.J. 519, 531-32, 816 A.2d 164, 171 (2003) where it specifically adopted "mixed motives" analysis in age discrimination cases under the LAD. "Where an employee is able to satisfy this rigorous burden and establish a direct prima facie case that age, per se, was a substantial factor in an adverse employment decision, the burden then shifts to the employer to show it would have made the same decision even in the absence of the impermissible consideration." Commercial Bank v. Sisler, Id. "We are satisfied that if these assertions are credited by the court, the adoptive admission of Good's head nod would then qualify as direct evidence sufficient to shift the burden of persuasion." McDevitt v. Bill Good Builders, Inc., supra. To do so would mean the complete abolishment in New Jersey of mixed motives analysis in regard to all claims of discrimination.  In any event this court as a federal court determining a matter of state law is bound to follow these decisions of New Jersey's highest court until they are overruled. Erie v Tompkins, 304 U.S. 64 (1938).  Thus, if this court finds that the plaintiff has presented direct evidence of discrimination then it must apply a mixed motives analysis to the Plaintiff's LAD claims.

-11-

## Point II

**Plaintiff Suffered an Adverse Action
When He Was Denied a Position in the
K-9 Unit.**

In <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 71, 126 S. Ct. 2405, 2417(2006) the Supreme Court dealt with the issue of whether a reassignment of a worker from a fork lift to track worker constituted an "adverse action."[2]  The Court held: "To be sure, reassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  The Court also observed that "the jury had before it considerable evidence that the track laborer duties were 'by all accounts more arduous and dirtier'; that the 'forklift operator position required more qualifications, which is an indication of prestige.'and that 'the forklift operator position was objectively considered a better

---

[2]In this matter the plaintiff asserted that the reassignment of her from one job to another was an adverse action while in our case the issue is a failure to grant a reassignment. It is submitted that this is a distinction without a difference and to not so hold would be akin to saying that a demotion to a lower paying title is an adverse decision while a failure to promote to a superior better paying title is not.

-12-

job and the male employees resented White for occupying it.'" *Id.*

The Plaintiff does not challenge the premise asserted by the defense from unreported opinions that the "denial of a request for a <u>purely lateral transfer</u> does not, by itself, constitute adverse employment action." *Defense Brief, pg.10.* However, the reassignment sought by the Plaintiff to K-9 involved much, much more that a "purely lateral transfer." It involved the learning and mastering of special qualifications and skills applicable only to the position sought and not the position the Plaintiff wanted to leave. It involved the opportunity to hold a position of prestige and esteem in the civilian and police community as officers and much of the public have a special appreciation for police K-9s as evidenced by the recent outpouring of grief over the death in the line of duty of a Gloucester Township canine. In addition the Plaintiff was denied tangible opportunities for additional economic gain in the form of increased overtime, a vehicle, and being compensated for caring for the dog.

Finally the ramifications of this argument by the defense if accepted in this particular case involving refusal to grant an assignment to a special highly skilled and prestigious position, are directly at odds with all discrimination law. If the Defendant's argument is extended to its logical conclusion a police department without fear of violating Title VII or the LAD could have written policies such as: "No woman officer shall serve as K-9

officer" or "No African American officer shall be assigned to a patrol unit that patrols white neighborhoods." This would simply be rather perverse.

In summary, the Plaintiff did indeed suffer an adverse employment decision.

### Point III

**The Plaintiff Has Sufficient Evidence that He Possessed the Minimum Qualifications For the K-9 Position and the Issue of Whether He Lived Too Far From the Police Station Should be Left to the Pretext Stage.**

"The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that [h]e applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 1094 (1981). Under this lenient standard the plaintiff has established that he was qualified for the position sought.

In this case each of the emails soliciting candidates for the K-9 position made not mention of a distance qualification. The only stated qualifications were initially that you be a superior

officer and then later it was amended to "any" officer.   The
Plaintiff certainly met the qualification of being a superior
officer or an officer.

In addition the Defendant has never presented a written
job description or formal policy establishing the parameters of the
"too far" qualification.  All the Defendant has done is claim that
this was a qualification <u>after</u> the plaintiff applied for the
position and was rejected.  As a result the Defendant's assertion
of this distance issue is an explanation that should be handled
under the pretext stage of the analysis and the court should reject
the Defendant's argument that the Plaintiff failed to establish
that he was qualified for the position sought.


### Point IV

#### That Non-Members of Plaintiff's Protected Class Were Not Treated More Favorably Proves Nothing.

In <u>Marzano v. Computer Science Corp. Inc.</u>, 91 F.3d 497,
509 (3rd Cir. 1996) our Court of Appeals rejected the argument that
a "Plaintiff must prove that others not within the protected class
did not suffer similar adverse employment actions as the
Plaintiff." *Defendant's Brief pg. 15.*  The Third Circuit stated:

> "<u>That non-protected employees were terminated
> along with the plaintiff proves nothing.</u>
> Suppose that an employer, who has two black
> employees, needs to terminate five employees
> for economic reasons. Suppose, further, that
> the employer decides to take advantage of this

-15-

situation to get rid of its two African-American employees; it would still be required to terminate three non-protected employees on account of its financial situation. Under the district court's analysis, the black employees could not prevail in a discrimination action, even though protected status was the cause for their layoff." (Emphasis supplied.)

Here the Defendant argues that because a younger officer (i.e. another "not within the protected class") was also rejected for the K-9 position, the Plaintiff's *prima facie* case must fail. Under the foregoing precedent this argument is simply without merit.

### Point V

**Factual Issues Exist as to Whether the Presently Claimed Legitimate, Non-Discriminatory Reason for Selecting Other Officers for K-9 Was the True Reason or a Pretext.[3]**

"[T]o defeat summary judgment when the defendant answers

_____

[3]In the administrative proceedings before the EEOC the City contrary to its present strategy presented a bag full of justifications for the decision. *See, Position Statement of City of Vineland, Dated July 16, 2008, Exhibit A to this Brief.* On this occasion the main reason given was "Again, because the decision was made that the K-9 handlers would come from the ranks of patrolmen, Sgt. Swain was not considered." *Id. Pg 3.* Now in the portion of the testimony quoted by the Defense in their present brief at pg. 17, the "radius" was the "sole basis." In addition the Position Statement contained the statement "Since Sgt. Swain had in excess of 25 years on the department and therefore, more than adequate number of years to retire, if he thereafter retired, the City would have expended in excess of $6,000.00 for training that would have been lost." It is submitted that this is a classic age bias statement: "Don't hire him because of his age he's just going to retire."

the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994). Here the Plaintiff has presented direct evidence of discrimination of a "but for" nature. One of the decisionmakers actually told the Plaintiff that age was the main reason. In addition the City had a written policy actually permitting age discrimination against police officers.  The justifications based on distance are sketchy and the Plaintiff at his deposition gave examples of situations where the claimed distance policy for take home vehicles was not followed in regard to other officers.  There exists virtually no documents supporting the claimed policies.  As exemplified by the  Position Statement referred to in footnote #2 *supra*, the Defendant has engaged in shifting explanations.  Thus a jury could easily find pretext.

In addition the Plaintiff's statements about what was stated to him are not "<u>vague</u>" self serving statements.  He has testified under oath as to comments made directly to him about his age being the reason for the rejection.  Whether the Plaintiff is lying or telling the truth in regard to this is for the jury not

-17-

the Court to decide as it is strictly a credibility issue.

Finally the Plaintiff based upon his direct evidence is entitled to have the burden shifted to the employer to show that it would have made the same decision in the absence of the prohibited factor in respect to his LAD claims.  <u>Bergen Commercial Bank v. Sisler</u>, *supra;* <u>McDevitt v. Bill Good Builders, Inc.</u>, *supra.*

In sum the Plaintiff has sufficiently placed in question the justifications offered by the employer.

**Point VI**

**The Plaintiff Has Established a
*Prima Facie* Case of Retaliation.**

"[T]o establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the protected activity and the adverse action.  <u>Barber v. CSX Distribution Services</u>, 68 F.3d 694, 701 (3d Cir. 1995).

The Plaintiff engaged in protected conduct when he complained that he to his superiors that he thought his age was a factor and then filed charges with the EEOC. He then was subjected to adverse employment actions in the form of harassment that was so severe and pervasive that it altered the terms and conditions of his employment.

The Defendant in its motion fragments the incidents cited by the Plaintiff and then argues that each one individually doesn't

-18-

rise to the necessary level of severity.  This is an inappropriate approach because "it is settled law that courts should not consider each incident of harassment in isolation. Rather, a court must evaluate the sum total of abuse over time." <u>Durham Life Ins. Co. v. Evans</u>, 166 F.3d 139, 155 (3d Cir. 1999) Furthermore in respect to the drug test and the denial of medical treatment the conduct was in each instance severe and without justification.

Finally D' Augostine's memo which documents the first act of harassment (the calling in of the Plaintiff because he heard a rumor the Plaintiff was filing a discrimination lawsuit) establishes the necessary link.  Even without this temporal proximity is present in that the situation quickly escalated after the Plaintiff refused to change at D'Augostine's demand his claim that the Captain had mentioned age.

In summary the Plaintiff has established a *prima facie* case of retaliation and as to the Defendants's final arguments, that "we didn't do it" and the facts don't support what the Plaintiff claims occurred, the Plaintiff relies on the facts set forth in detail in his R. 56.1 Statement.

## <u>CONCLUSION</u>

For the foregoing reasons it is respectfully requested that the Court deny the Defendant's motion for summary judgment and allow this matter to proceed to trial.


Respectfully submitted,

F. MICHAEL DAILY, JR., LLC
ATTORNEY FOR THE PLAINTIFF

*s/F. Michael Daily, Jr.*

BY:_____
F. Michael Daily, Jr.


Dated: March 25, 2011

-20-



City of
*Vineland*
New Jersey

**RICHARD P. TONETTA, ESQ.**

717 ELMER STREET
VINELAND, NEW JERSEY 08360

Telephone: (856) 794-1400
FAX: (856) 794-1035
http://www.ci.vineland.nj.us
E-mail: rtonettaesq@comcast.net

July 16, 2008

Equal Employment Opportunity Commission
Philadelphia District Office
801 Market Street, Suite 1300
Philadelphia, Pa. 19107

Attn: William D. Cook, Enforcement Mgr.

Re: Harry Swain

Dear Mr. Cook:

  Please find enclosed herewith our submission in accordance with a charge of discrimination.

Part I - General Information

  1.  City of Vineland, 640 Wood Street, Vineland, New Jersey.

  2.  Police Department, City of Vineland, a Municipal Corporation of the State of New Jersey.

  3.  Police Officers - approximately 190
    Total employees - approximately 700

Part II - Position Statement

  The Chief of the City of Vineland Police Department determined that it would be in the best interest of the Department to expand the K-9 Unit which was presently manned by one Sergeant. The task for making recommendations regarding the unit was left to Capt. Paul Letizia. At first, Capt. Letizia considered the possibility of appointing two sergeants to the position of dog handler. The position is not an increase in pay or salary. On December 3, 2007, an e-mail was forwarded to sworn officers requesting two sergeants who may have an interest in being a dog handler. (See attached S1).

  On December 4, 2007, Sgt. Harry Swain responded to the e-mail by sending an e-mail that expressed his interest in the position. (See attached S2).

  Sgt. Swain indicated that he had been interested in the position and that he had knowledge



*Special arrangements for persons with disabilities may be made if requested in advance by contacting the Business Administrator's Office at 856-794-4144.*

*Printed on Recycled Paper*

EXHIBIT A TO BRIEF



Page Two

of the position because his father was also a K-9 Officer. Sgt. Swain further indicated that he was moving from his home and relocating to 139 Cool Run Road, Bridgeton, New Jersey, which is 18 miles from the Vineland Police Station. (S2).

Capt. Letizia who is also the Captain of the Patrol Division was contemplating the possibility of making these assignments to the positions for Patrol Sergeants, however, no decision had been made at that point.

After meetings with senior staff of the Police Department, it was determined that the K-9 Officers would be better assigned to a patrolman on each platoon rather than two Sergeants. This determination was made since there was already one police dog assigned to a Sergeant and if the new dogs were assigned to patrolmen, the existing Sergeant by virtue of rank would be the Officer in charge and there would therefore be created the Vineland Police Department K-9 Unit. This made more sense than having three Sergeants all in the same unit.

Thereafter on December 21st a subsequent e-mail was forwarded asking for any patrolmen who were interested in being a K-9 handler. (S3). Captain Letizia received approximately 20 e-mails from different patrolmen who expressed an interest in the position.

There were several meetings of the senior staff, including Patrol Division Lieutenants and Sergeants in the Patrol Division wherein criteria was discussed regarding the appointment. At this time, the Chief of Police did not make a formal determination as to whether the unit would consist of one Sergeant and patrolmen under the Sergeant as a unit, or whether they would all be Sergeants. However, it seemed that the consensus at this point was to have one Sergeant and two Officers within the unit.

Sometime in December of 2007, Sgt. Swain came to see Capt. Letizia to speak with him about the K-9 position. Again, the Sergeant expressed his interest in the position, at which time Capt. Letizia informed the Sergeant that no final decision has been made regarding the selection but the criteria that they were looking at included the fact that they were focusing on patrolmen rather than Sergeants, as well as issues pertaining to the home address of the Officers, as well as other criteria, including the health and physical condition of the Officers to serve in the unit.

It is important to note that Capt. Letizia and Sgt. Swain are friends through the Vineland Police Department and in fact, graduated the academy together and served at Vineland Police Department for 25 years. Capt. Letizia considers Sgt. Swain a personal friend and they have socialized both inside and outside of the workplace on many occasions throughout their careers. During this meeting, Capt. Letizia spoke frankly with Sgt. Swain and indicated he did have a concern

EXHIBIT A TO BRIEF



*City of*
**Vineland**
*New Jersey*

Page Three

about his physical condition inasmuch as K-9 training is a very vigorous program. Capt. Letizia suggested that Sgt. Swain give any information he has regarding the mileage to and from his new home that he has to headquarters and speak to the Chief of Police regarding the matter.

After consideration and speaking with senior staff, in the beginning of January 2008, a decision regarding the members of the K-9 Unit was made in that the unit would consist of the existing Sergeant as well as two patrolmen who would report to the Sergeant as a chain of command, rather than three Sergeants in the same unit. The criteria for the selection process included:

1.   Past performance of the Officer;

2.   Likelihood that the Officer would successfully complete the training;

3.   Response time to headquarters when re-called as required 24 hours, 7 days per week;

4.   K-9 Units command structure within the Vineland Police Department;

5.   The recommendation/suggestion from the personnel within the Vineland Police Department; and

6.   The cost of the K-9 dogs and associated training costs in relation to the continued employment of the selected employee.

After utilizing this criteria, a recommendation was to have Officer B. Bontcue and Officer C. Mackafee as the K-9 handlers.  Again, because the decision was made that the K-9 handlers would come from the ranks of patrolmen, Sgt. Swain was not considered.

Notwithstanding this command decision regarding the use of patrolmen rather than Sergeants, Sgt. Swain lived 18 miles from the City of Vineland and, therefore, any call which would be required for a K-9 Unit, would take Sgt. Swain well in excess of 30 minutes to appear at the scene.  Utilizing K-9 is typically done on emergent basis, either because of an incident in progress or a search.  The time frame for travel was simply not acceptable.  Further, a consideration was made with regards to the cost of K-9 and training to be in excess of $6,000.00.  The K-9 dog and an Officer would be trained together going through a rigorous program. Once the training is complete, the K-9 and the Officer work as a team and it is recommended that should the Officer retire from the department, likewise, the K-9 dog would be retired.  Since Sgt. Swain had in excess of 25 years on the department and therefore, more than adequate number of years to retire, if he trained with a K-9 partner and then

*Printed on Recycled Paper*

EXHIBIT A TO BRIEF



*City of*
**Vineland**
*New Jersey*

Page Four

thereafter retired, the City would have expended in excess of $6,000.00 for training that would have been lost and thereafter, would have had to spend an additional sum in excess of $6,000.00 to train a new Officer and K-9 dog, thereby costing the tax payers of the City of Vineland well in excess of $12,000.00.   Therefore, as indicated, one of the criteria considered was the number of years in the department, not the age of the individual and the logical and reasonable  anticipation of continued employment.

Further, during the discussion between Sgt. Swain and Capt. Letizia on past occasions, Sgt. Swain made it clear to Capt. Letizia that he was out of shape and that his physical conditioning was less than adequate.  Capt. Letizia did in fact discuss this with Sgt. Swain and explained to him that the training was rigorous and that he needed to consider whether he had the ability to perform the training necessary.

During the first week of January, Capt. Letizia was advised that Sgt. Swain instructed his Lieutenant, Lt. Dennis D'Augostine that he was upset by the selection and he felt he was discriminated against because of his age and physical condition. Capt. Letizia instructed Sgt. Swain through his Lieutenant to document the complaints and for Sgt. Swain to submit a written report on his complaint.  A memorandum was completed. (S4)

Lt. D'Augostine further  indicated that Sgt. Swain thought he was being harassed and was the victim of work place discrimination.  No complaint was recorded or filed by the Sergeant as requested.

On January 9, 2008, Capt. Letizia forwarded a memorandum to Sgt. Swain requesting that he submit his complaint directly to Internal Affairs for investigation.  This memorandum was hand delivered by Lt. Cleveland on January 14, 2008. (See S5)

Sgt. Swain submitted a memorandum to Internal Affairs indicating he had retained counsel and he thought he was the victim of  workplace discrimination and that he was willing to discuss the matter with Internal Affairs with his attorney present.  (See S6)  On January 16, 2008, Capt. Lauria and Internal Affairs Officers met with Sgt. Swain and his attorney Michael Daily to discuss the matter and  identify the Sergeant's concerns.  At that time attorney Daily stated that he did not want the Vineland Police Department to investigate the concerns and that they were going directly to the EEOC with their complaint.  (See S7)

It is unknown what facts or circumstances Sgt. Swain has complained of regarding his charge of harassment.  No such information has ever been supplied to the department.

EXHIBIT A TO BRIEF



Page Five

Part III - Response to Charge

1.    See all attached documentation.

2.    The selection of personnel to a particular duty assignment is clearly specified in
      N.J.S.A. 40A:14-118, as well as the Sergeants' Employment Contract at Article 2-
      Management Rights (See S9).

3.    All Captains of the Police Department, Chief of the Police Department, all Lieutenants
      in the Patrol Division.

4.    It is unknown of any action regarding harassment over the charge of discrimination.
      As indicated, there was a specific criteria utilized for the decision, no person received
      more of a favorable  treatment but the decision was made based upon the
      aforementioned criteria.

5.    There was no discriminatory termination, lay off or demotion.

6.    See attached E-mails.

7.    (A)    Patrolman Bontcue and Patrolman Mackafee;
      (B)    First week of January 2008.
      (C)    Position was to be filled by Patrolmen as opposed to Officers based upon
             criteria outlined herein above.
      (D)    There is no salary increase for this position.

8.    Not Applicable.

9.    No facts are known with regards to the allegation of retaliation.

10.   None to this answering respondent's knowledge.

11.   It is unknown how this matter might be resolved inasmuch as it is the Police
      Department's requirement that they provide the best protection and services to the tax
      payers of the City of Vineland.

*Printed on Recycled Paper*

EXHIBIT A TO BRIEF



Page Six

  If there is any further information requested, please feel free to contact my office.

         **Very truly yours,**

         **Richard P. Tonetta, Esquire**
         **Associate Solicitor, City of Vineland**

**RPT/sl**

**Enclosure**

EXHIBIT A TO BRIEF